FILED

2010 Jul-07  PM 12:04
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **DR. EDWARD M. STELLMACHER** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:** |
| | ) | **5:08-cv-00481-JEO** |
| **THE BOARD OF TRUSTEES OF THE** | ) | |
| **UNIVERSITY OF ALABAMA,** and | ) | |
| **DR. ALLAN J. WILKE,** an individual, | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

Before the court is the motion of the defendants, the Board of Trustees of the University of Alabama and Dr. Allan J. Wilke (hereinafter "Defendants"), for summary judgment on the claims of Dr. Edward M. Stellmacher (hereinafter "Plaintiff"), filed on February 17, 2010.  (Doc. 28).[1,2]  The motion has been fully briefed and is now subject to the court's review.  Upon consideration, the motion is due to be granted.

---

[1]  References herein to "Doc.___" are to the document number assigned by the Clerk of the Court in the court file.

[2]  The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73.  (*See* Doc. 10).

## I.    FACTUAL HISTORY[3]

Plaintiff was born in Miami Shores, Florida, on April 30, 1970.  (Pl. Dep. Ex. 2, p. 2).[4]

His father was a citizen of Germany at the time of Plaintiff's birth, and became a dual citizen of

Germany and the United States when Plaintiff was ten years old.  (Pl. Dep. p. 162).  Because his

father held dual citizenship, Plaintiff also became a dual citizen of Germany and the United

States.[5]  (Id.).  Based on the information before it, the court cannot discern whether Plaintiff was

raised by his father, to what extent he knew his father during childhood, or whether he has ever

lived in Germany.  At some point – also unspecified in the record – Plaintiff was adopted by his

stepfather, who is recorded as Plaintiff's father on his current birth certificate.[6]  (Pl. Dep. p. 31;

Pl. Dep. Ex. 2, p. 2).

Plaintiff attended, but did not graduate from, Widener University in Chester,

Pennsylvania between September 1988 and May 1989.  (Pl's Application for Graduate Medical

Education, Pl. Dep. Ex. 2 p. 3).  He later earned a Bachelor of Science degree in Microbiology

and Cell Science from the University of Florida in Gainesville, Florida, and a Doctor of Medicine

---

[3]  These are the facts for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11ᵗʰ Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts'") (citation omitted).  Facts are undisputed unless otherwise noted.  Where the facts are in dispute, they are stated in the manner most favorable to the plaintiff.  *See Fitzpatrick v. City of Atlanta*, 2 F.2d 1112, 1115 (11ᵗʰ Cit. 1993).

[4]  Plaintiff's deposition transcript is located at Doc. 28 in the court's record.  Exhibit 2 of the deposition is Plaintiff's "Application for Residency" to the Family Medicine Residency Program of the University of Alabama at Birmingham's Huntsville facility.  Page 2 of Plaintiff's Application is a copy of Plaintiff's Birth Certificate, issued by the State of Florida's Office of Vital Statistics.

[5]  The record does not indicate when Plaintiff acquired his German citizenship.

[6]  Plaintiff's stepfather's name is Hobart Leon McCollum.  (Pl. Dep. 30).  Plaintiff does not argue, nor is there evidence to suggest, that Mr. McCollum is of German national origin.  As stated, it is not clear when Plaintiff was adopted by his stepfather.  Plaintiff's current birth certificate was issued July 11, 1996, when Plaintiff was 26 years old.  (Pl. Dep. Ex. 2).

degree at Ross University in Dominica, West Indies. (Id.). He spent his first year of residency at the family medicine program of the University of Tenneessee's Memphis campus, where he was employed at Saint Francis Hospital from 2003 through much of 2004. (Pl. Dep. p. 10). Dissatisfied with that program's emphasis on obstetrics, Plaintiff "decided to migrate" to another residency program sometime in 2004. (Id.).

Plaintiff pursued opportunities at other schools, including the University of Alabama-Birmingham's Huntsville branch medical campus at Huntsville Hospital (hereinafter "UAB-Huntsville" or "the Program"). (Id. p. 14; Behringer Dep. pp. 8, 19[7]). He first applied to UAB-Huntsville in December 2004 or January 2005 and again in the fall of 2005. (Pl. Dep. p. 18). He did not include the name of his biological father in any paperwork he submitted to the Program. (Id. p. 31).

In September 2005, Plaintiff spoke with the Program's director, Dr. Allan Wilke (hereinafter "Dr. Wilke"), by telephone and again during an in-person interview. (Id.). Plaintiff interviewed separately with Dr. Wilke and two other faculty members, Dr. Melissa Behringer (hereinafter "Dr. Behringer"), and Dr. James Moncier, and a second-year resident, Dr. Jeff Garrard. (Id. pp. 20-21).

Plaintiff testified that each interview "went very well," except for his interview with Dr. Behringer. (Id. p. 22). According to Plaintiff, Dr. Behringer was "adamant" that "she had some sincere misgivings" about whether he could obtain a permanent Alabama license because he had not completed certain prerequisites for admittance to the Program within a specified period of

---

[7] The deposition of Dr. Melissa Behringer is located at Ex. B-1 to Defendant's Motion for Summary Judgment (Doc. 28).

time.  (Id. pp. 23-24).  Plaintiff testified that "my inclination was that this was an individual who probably wasn't in favor of my employment" in the Program.  (Id. pp. 23-24).  Noting that his curriculum vitae indicated he was fluent in German, English, and Spanish,[8] Dr. Behringer asked if he was born in Germany or the United States.  (Id. pp. 24-26).  He answered that he was born in the United States but is a dual citizen of the United States and Germany.[9]  (Id. p. 24).

After Plaintiff spoke with each doctor, Dr. Wilke offered him a position in the Program. (Id. p. 22).  Dr. Behringer was appointed Plaintiff's faculty advisor.[10]  (Id. p. 32).

Plaintiff's contract with the Program began October 1, 2005.  (Pl. Dep. Ex. 1, pg 2). According to Plaintiff, Dr. Wilke "needed a second-year supervisor pronto," and he asked Plaintiff to begin work almost immediately, with little training into the hospital's daily operations.  (Pl. Dep. pp. 40-42).  He left Memphis without collecting his belongings, and began work on or about October 1.  (Id. p. 41; Pl. Dep. Ex. 1, p. 2).

Very early in his tenure with the Program, the faculty began to raise concerns about Plaintiff's initial performance.  (Pl. Dep. Ex. 8).  These included his tendency to leave critical

---

[8]  It is not clear which of these was Plaintiff's first language, or how he learned to speak German or Spanish.

[9]  Dr. Behringer testified that she does not recall this conversation, or that she ever spoke with Plaintiff about his national origin, his place of birth, or his countries of citizenship.  (Behringer Dep. pp. 46-48).  She also did not recall seeing anything on Plaintiff's curriculum vitae to indicate that he spoke a language other than English.  (Id. p. 46).  At this juncture, because these facts are in dispute, the court accepts Plaintiff's version of events.

[10]  Dr. Behringer described her duties as a resident advisor as follows:

> In general, I am supposed to sit down with [the resident] at a periodic basis, review their academic or educational file with them, discuss what concerns or issues they have, make suggestions about further courses of study or action.  If there are academic or professional concerns that are brought up by other faculty, I am to bring those to the resident and discuss with the resident and formulate a plan of remediation with the resident....  If they continue to occur, then, the residency director then comes in and sets a more rigorous plan of remediation and/or disciplinary action.

(Behringer Dep. pp. 22-23).

information out of discharge summaries, and his habit of speaking too quickly during presentations.  (Id.).  On October 6, 2005, Dr. Behringer met with Plaintiff to address these concerns.  (Id.).  She noted that she had to ask him several times to slow down during his presentations so she could understand what he was saying.  (Id.).  Plaintiff acknowledged Dr. Behringer's advice and indicated that he would make efforts to address these areas for improvement.  (Behringer Dep. p. 25).

Dr. Behringer met with Plaintiff again on December 16, 2005.  (Pl. Dep. Ex. 8).  While she commended his "high energy and good fund of knowledge," she told him of additional concerns raised by the faculty.  (Id.).  These included his need "to develop control of his actions, to have an awareness of social interactions, and to structure data and tasks."  (Id.).  The record contains few details of the bases for these concerns, or of Plaintiff's response when Dr. Behringer brought them to his attention.

In early January 2006, Plaintiff returned to Memphis to collect his belongings.  (Pl. Dep. p. 41).  The Program had just instituted a new electronic system for requesting time off, but Plaintiff had not been trained to use the system.  (Id. p. 42).  He was scheduled to work a rotation in pediatrics during his time away, but he testified that he informed his attending physician he would be absent from work for two weekdays during the rotation.  (Id. pp. 41-42).  He did not complete any paperwork to formalize this arrangement and was, apparently, considered absent without leave.  (Id. p. 41).  He testified that

> when I was gone [to Memphis] those days, [Dr. Wilke] tried to contact me.  And as was his habit when he couldn't get a hold of somebody, he got exceptionally mad and exceptionally unbelievably enraged that I didn't respond back....  I thought at the time that his response to this was way out of proportion....

(Id. p. 43).

On January 9, 2006, Plaintiff met with Dr. Wilke and Dr. Behringer to discuss his

absence.  (Id. p. 39; Memorandum dated January 9, 2006 (Pl. Dep. Ex. 4)).  During the meeting,

Dr. Wilke presented Plaintiff with the following memorandum:

> Last week, on Thursday and Friday, [Plaintiff] was in Memphis moving his belongings.
> He reports telling his pediatric attending [physician] and a pediatric secretary about this,
> but he did not initiate the required paperwork....  I emphasized with Dr. Stellmacher that
> this was a breach of professionalism.... [Therefore,] [h]is residency will be extended by 4
> days.  Any further unprofessional behaviors will be grounds for dismissal.

(Pl. Dep. Ex. 4).

Also discussed during the meeting were allegations of "disruptive behaviors" by Plaintiff.

(Id.).  Plaintiff testified that he "tried to ask [Dr. Wilke to] elucidate specifically what he meant

by ['disruptive behavior'].  He never gave me any direct answer....  I one hundred percent

adamantly defy Dr. Wilke to explain to me what occasions [he was] talking about for disruptive

behavior."  (Pl. Dep. pp. 42, 49).  Though he offered no direct response, Dr. Wilke informed

Plaintiff that "[i]t was the consensus of the faculty that he should be evaluated to rule out any

underlying mental illness."  (Pl. Dep. Ex. 8; Pl. Dep. p. 44; Behringer Dep. p. 55).  Plaintiff

testified:

> My jaw hit the floor.  I'm looking at this guy saying I just busted my hump for you for the
> past two months on service, this is the first I have heard of any of this, any of it.  What do
> you mean neuro – but I am a new person, I just started working here only two months
> previously.  My response is to say to this guy I disagree, I don't think that's the case at all.
> What are my options?  This is where Dr. Wilke, in my professional experience with him,
> acted deceitful.  He said to me you can file a complaint and fight it, but you will have to
> go down, there will be long, lengthy meetings, you will be in Birmingham, you may miss
> more time, it could be very advantageous to somebody just starting out.  I would just go
> ahead if I were you and agree to the neuropsych testing....  Later, from a classmate of
> mine, I found out that when you get in trouble, one of the first things they try to do is try
> to tag somebody with this unstable mental illness type picture.  I was shocked.  It's

tantamount to almost character assassination, okay?

(Pl. Dep. pp. 44-45).[11]

Plaintiff was given the names of two psychologists to schedule an evaluation.  (Id. p. 47).

According to Plaintiff, he was unable to reach either doctor.  (Id.).  Dr. Wilke purportedly told

Plaintiff this was "fine" and, Plaintiff testified, the matter was forgotten.[12]  (Id. pp. 47, 58).

Dr. Behringer's next review with Plaintiff was April 21, 2006.  (Pl. Dep. Ex. 8).  She

commended Plaintiff for his improved performance, but communicated the faculty's concern that

he still needed to "slow down," that he often spoke too quickly and too loudly, paid too little

attention to "his own contribution to interpersonal dynamics," and that he needed to pay more

attention to his work schedule to ensure he reported on time to the correct duty location.[13]  (Id.).

On May 22, 2006, Dr. Lourdes Corman, the Division Chief of Internal Medicine at

Huntsville Hospital and an attending physician in that department, complained to Dr. Wilke that

Plaintiff did not report to work that day, did not answer his pages or see his assigned patients,

and did not provide oversight to a first-year resident whom he was scheduled to supervise.[14]

(Id.).  Dr. Behringer addressed the complaint with Plaintiff and, according to Defendants,

---

[11]  The record contains no evidence that other residents in the Program (of foreign or American national origin) were asked to undergo a psychological evaluation.

[12]  The court notes a disparity in the record on this point.  In a written statement by Dr. Wilke to the Graduate Medical Education Department dated November 7, 2006, Dr. Wilke expressed that, after multiple requests by the Program, Plaintiff did at some point undergo psychiatric testing, including the Minnesota Multiphasic Personality Inventory, but failed to follow up with his psychologist to complete the evaluation.  (Pl. Dep. Ex. 8). The court cannot discern from the record any further information regarding these tests, including their results, the name of the psychologist who administered them, or when they were taken.

[13]  The record again contains few details, if any, of the factual bases for these concerns.

[14]  Plaintiff offers no explanation for why he missed work or failed to respond to pages on this date.

reminded him of the Program's request that he undergo a psychological evaluation.  (Id. pp. 8-9).

On June 20, Dr. Wilke asked Plaintiff to schedule the evaluation by June 30.  (Id. p. 9).  Plaintiff

disputes that Dr. Behringer or Dr. Wilke asked him for a psychological evaluation at this time,

and maintains that the Program requested the evaluation only once in January 2006, and not

again until the following August.  (Pl. Dep. p. 66).

Meanwhile, by June 2006, Plaintiff had become dissatisfied with Dr. Behringer as his

faculty advisor.  (Id. p. 32).  While no specific conflicts are mentioned in the record, Plaintiff

testified that

> I just don't think that she took a very genuine interest in my comments..., [and in June
> 2006] I expressed [to Dr. Wilke] that there was a personality incompatibility with Melissa
> Behringer, that I did not feel that she was looking out for my best interest, that I wanted a
> new faculty advisor, that she was doing nothing to help me; if anything, she was being
> exceptionally overcritical....   In spite of my continuing to pass each of my rotations, she
> didn't seem to be very complimentary in any – have any kind of validation [of my work].

(Id. pp. 33, 39).  According to Plaintiff, Dr. Wilke was unresponsive to his request for a new

advisor, and stated that "contrary to my belief, he felt Dr. Behringer was supporting me.  I told

him I didn't think that was possible."  (Id. p. 34).

In July 2006, Dr. James Light, an attending physician in the obstetrics department,

complained that Plaintiff was absent from his assigned duty location in the department and had

failed to respond to three pages.  (Id. p. 64).  Plaintiff testified that he was working with a new

intern in the pediatrics department when he received the pages.  (Id. p. 65-67).  He testified:

> I didn't know who [was paging me].  And I got the same number come up like twice and I
> had no clue of who it was.  Anyway, the third time it happened, I was already down in the
> OB department....  [I]t might have been Dr. Light.  He was absolutely furious and
> screaming I didn't answer his pages.  But ... it was about a routine discharge.  And this
> guy was using complete profanity, it was inappropriate, it was unprofessional, to say the
> least, and I snapped back at him.  And this blew up into a situation about me not

answering pages and not being at an assigned duty location....  I thought it was one of my friends calling me on my personal pager, because it was my personal pager....  I said, look, I tried calling this number three times.  What I was doing was entering the number wrong, obviously.  Didn't matter.  I had yelled back at the attending [physician] during the course of this discharge, and he was absolutely incensed.

(Id. pp. 64-67).

On August 15, 2006, Dr. Tiffani Singelton, another attending physician in the obstetrics department, complained to Dr. Wilke that Plaintiff "reported an incomplete and inaccurate history to her on a patient" who was five months pregnant, and who turned out to be in preterm labor.  (Pl. Dep. Ex. 8).  According to Dr. Singleton, Plaintiff "neglected to inform her that the patient was complaining of passing clots and ... he had documented 'membranes intact' and 'cervix closed' when he didn't actually examine the cervix."  (Id.).

Two days later, Plaintiff misread his schedule and reported to a nursing home when he was assigned to work again in the obstetrics department.  (Pl. Dep. pp. 70-71; Pl. Dep. Ex. 8).  Despite being paged "repeatedly" by Dr. Singleton, Plaintiff did not respond.  (Pl. Dep. p. 72).  He later testified that he left his pager in his lab coat, which was draped over a chair for two hours while he saw patients in the nursing home.  (Id.).  Plaintiff understood that he was required to keep his pager with him at all times, but he took his coat off with the pager in the pocket because he felt hot inside the nursing home.  (Id. p. 73).  He described it as "an honest mistake," but Dr. Singleton reported the incident to Dr. Wilke.  (Id. p. 70).  Plaintiff testified that

> A:     [S]omehow or another they had me on the OB-GYN PGY1 [schedule], and that
>        was probably why ... I was confused, because I was not a PGY1.  I was a PGY2.[15]
> Q:     Did you ask anybody about that?

---

[15]  The parties do not dispute that "PGY1" and "PGY2" refer to "post-graduate year one" and "post-graduate year two," respectively.  (Doc. 30, p. 1, ¶ 24).  Doc. 30 comprises Plaintiff's evidentiary submission to support his opposition to Defendant's Motion for Summary Judgment.

> A:    Yeah, after the whole thing blew up.
>
> Q:    I mean prior to reporting to work, did you ask anybody to clarify the confusion?
>
> A:    Oh. No. I hadn't seen it until after then. Because we had a couple of different schedules. It was very confusing.... [I]t was a little more taxing than it should have been, yes, to say the least. And so I confess I made a mistake, right.

(Id. pp. 71-72). According to Defendants, the obstetrics ward was left without a resident that day and Dr. Singleton was concerned that "patient care could be compromised" by Plaintiff's absence. (Pl. Dep. Ex. 8).

When asked if these were the only occasions when he failed to respond to a page, Plaintiff testified "[n]o, I think there might have been a couple other times ... you know, when you are doing a workup on a patient sometimes, you can't always answer every page immediately." (Id. p. 73). Plaintiff also testified that he was late to work perhaps once or twice between January and August of 2006, but that he called his supervisors in advance each time. (Id. p. 76). He testified that "other people would do the same thing all the time too. It never seemed to be an issue except when I did it."[16] (Id. p. 77).

Dr. Wilke and Dr. Behringer met with Plaintiff on August 18, 2006, to discuss Dr. Light's and Dr. Singleton's complaints. (Pl. Dep. Ex. 8). They admonished Plaintiff for failing to respond to pages, failing to appear at his assigned duty locations, arriving late to work, and failing to follow up on his psychological evaluation. (Pl. Dep. pp. 62-63; Pl. Dep. Ex. 5; Pl. Dep. Ex. 8). Plaintiff testified:

> this following up on the psychological evaluation, as you can see the date, January all the way to August, it was a nonissue until then. My personal belief, for the record, is that Melissa Behringer initiated this requisite for a neuropysch evaluation even after all the months it had died down and gone away, you know. One has to almost ask the question logically as well, too, if there was such a concern about [my] mental instability, why in

---

[16] Plaintiff offers no specific information in his brief, or in the record, to substantiate this claim.

> the hell did they let me work all of these months?  I mean, honestly.  That was never
> brought up.  This was a smear campaign, clear and simple.

(Pl. Dep. p. 66).  At the close of the meeting, Plaintiff was placed on probation and asked to

submit to a drug screen.  The results of the screen were negative, but it did show that Plaintiff

was taking Adderall, a prescription medication for Attention Deficit Disorder.  (Id. p. 69).

According to Plaintiff, Dr. Wilke told him to "just make sure you have taken your medication."

(Id.; Pl. Dep. Ex. 5).

Several weeks later, Plaintiff experienced a "flare up" of hemorrhoid, which had been an

ongoing problem for him for eighteen years.  (Pl. Dep. p. 92).  He testified that he "had a

hemorrhoidal tear ..., a prolapsed hemorrhoid," and that his condition worsened during the week

prior to Labor Day.[17]  (Id. pp. 82-83).  He testified:

> I wasn't that concerned about it at first, until it wouldn't stop bleeding.  And then by
> Friday [before Labor Day], this was a new element to it.  It was excruciating pain.  And
> then it kind of went away....  You know, a hemorrhoidal flare-up can go away, and it
> typically does.  This one didn't.  It progressively got from bad to very bad.

(Id. pp. 92-93, 95).

Plaintiff was scheduled to work at 6:30 on the Saturday morning before Labor Day.  (Id.

p. 96).  He did not notify Dr. Wilke, or anyone else in the program[18], of his condition, or that

there was any possibility he might not report to work on Saturday.  (Id. pp. 99-100, 109).  He

---

[17]  Dr. Behringer described a prolapsed hemorrhoid as a painful condition in which "dilated veins supplying the anal and rectal area ... have swollen to such an extent that they have fallen outside the anal ring and are external to the anus."  (Behringer Dep. p. 82).

[18]  In his initial Complaint, Plaintiff alleged that he called the Chief Resident, Dr. Jeff Garrard, on Friday, September 1, and informed him of his condition.  (Doc. 1, ¶ 25).  He also claimed to have called Dr. Garrard with updates on Sunday, September 3 and Monday, September 4.  (Id. ¶¶ 28, 29).  In his Amended Complaint, Plaintiff does not allege that he notified anyone in the Program of his condition.  In fact, the Amended Complaint makes no reference at all to Plaintiff's medical problem, or to the fact that he missed work Labor Day weekend.  (*See* Doc. 13).

explained that he "didn't think it was going to get that bad.  I honestly thought it would just go away....  It's kind of embarrassing, you know.  I mean, it's hemorrhoid.... [S]o you just hope it's going to go away.  And when it doesn't, it – you know, it's like I said, I didn't call anybody, no." (Id. p. 100).  He took a Benadryl the night before his shift, though he knew Benadryl could make him drowsy.  (Id. pp. 98-99).  He had not slept well for two or three days prior to this event and, after taking the Benadryl, he slept through his entire shift the following day.  (Id. pp. 92-93, 99).

The record contains no information to explain why Plaintiff did not call anyone in the Program after he woke up Saturday afternoon or at any point on Sunday.  On Monday, Plaintiff presented to the emergency room with increasing blood loss.  (Id. p. 90).  He was diagnosed with a hemorrhoidal rupture that would require extensive corrective surgery.  (Id.).  He was referred to Dr. Stephen Clark, a gastroenterologist, who confirmed the diagnosis and scheduled Plaintiff for surgery on September 21, 2006.  (Id. pp. 83-84; Pl's Ex. 17).

The record is unclear as to the order of events that followed.  Plaintiff apparently did not inform anyone in the Program about his condition – or offer any explanation for his absence over the weekend – until he spoke with Dr. Wilke and Dr. Behringer by telephone on Wednesday, September 6, four days after he missed work and two days after he went to the emergency room. (Pl. Dep. pp. 103-105).  The court cannot discern whether Plaintiff or Dr. Wilke initiated this call.  The record indicates that Dr. Daniell, who would have been Plaintiff's attending physician during Labor Day weekend, had already complained by then to Dr. Wilke that Plaintiff had not appeared for work as scheduled.  (Pl. Dep. Ex. 8).

According to Dr. Wilke, Plaintiff's failure to report to work was a problem for which he

12

had been placed on probation just two weeks before.[19]  (Id.).  Accordingly, he suspended Plaintiff

with pay until he could address the matter with the rest of the faculty.  (Id.; Def's Ex. 2).[20]

Around September 10, eleven days before Plaintiff's surgery, Dr. Wilke spoke with Dr. Clark,

who confirmed that Plaintiff's condition was severe, would require surgery, and that Plaintiff

would likely be absent from work for two weeks.  (Id. p. 84; Pl. Dep. Ex. 8).  Dr. Wilke asked

Dr. Clark to provide this information in writing for Plaintiff's personnel file.  (Pl. Dep. Ex. 8).

He apparently did not ask for a date certain by which he wanted it.  Dr. Clark told Dr. Wilke he

would be away from his office for approximately a month after Plaintiff's surgery.  (Pl. Dep. p.

85).

     Plaintiff never returned to work after Labor Day weekend.  (Id. p. 112).  After his surgery,

he spoke with Dr. Wilke at least three times by telephone to explain that he could not provide

written documentation of his condition while Dr. Clark was out of his office.  (Id. pp. 110-113).

Plaintiff offers no explanation for why Dr. Clark did not, or could not, provide such before he

left, nor does he refute Dr. Behringer's testimony that "there was time prior to the surgery for

such documentation to have been provided....  The requests were made long before September

21."[21]  (Behringer Dep. p. 68).

---

[19]  Dr. Behringer testified that most probation periods in the Program are between three and six months, depending on whether "significant complaints of a similar nature" have already been raised.  (Behringer Dep. p. 57). She acknowledged that Plaintiff's absence Labor Day weekend occurred while Plaintiff was still on probation, and explained that his absence "put into play the earlier discussed issues of notifying the faculty ... and the administration of the situation in a timely fashion...."  (Id. p. 58).

[20]  Defendants' Exhibit 2 is attached to Doc. 28 in the court's record.

[21]  Dr. Behringer provided the following testimony regarding the Program's procedure during a resident's medical leave of absence:

Q:     Is there an effort by the program through either the residents, chief residents, or more senior

(continued...)

Meanwhile, Dr. Wilke asked Plaintiff to follow up on his psychological evaluation no later than September 13.  (Pl. Dep. Ex. 8).  It appears that Plaintiff scheduled an appointment with his psychologist for September 27 but did not attend it.  (Id.).  Dr. Wilke learned of this when he received a letter from Plaintiff's psychologist, written to Plaintiff but forwarded to Dr. Wilke, requesting that he reschedule Plaintiff's missed appointment.  (Id.).

On October 6, the faculty recommended that Dr. Wilke terminate Plaintiff's appointment in the Program.[22]  (Id.).  Dr. Wilke informed Plaintiff of this decision by letter dated October 10,

---

[21](...continued)

> individuals to provide coverage and accommodate the resident with the medical problem?
>
> A:    There is if we are notified of the issue.
>
> ******
>
> Q:    And the management of the residency program would have clearly been notified of the problems Dr. Stellmacher was having, because you told me that Dr. Wilke informed you about these problems somewhere about the Tuesday after Labor Day, right?
> A:    That is my recollection.
> Q:    Okay.  And did y'all then work with and accommodate Dr. Stellmacher as he needed to take and recuperate from his surgery?
> A:    My understanding of the situation is that we did attempt to accommodate.  However, we also requested appropriate notification and estimates of time out.
> Q:    Well, if you did attempt to accommodate, then, why was he terminated for being absent?
> A:    The requests were made to get documentation even before the surgery occurred on September 21[st] as to what the nature of the problems [was] and how long the treating physician expected Dr. Stellmacher to not be able to perform his duties.

(Behringer Dep. pp. 42-43).

[22]  Dr. Behringer testified that, at the time of its recommendation, the faculty was not aware of any specific information regarding Plaintiff's condition:

> Q:    Were you aware at the time [of the faculty's recommendation to terminate Plaintiff] that he had problems with hemorrhoids and were very painful, and he was taking medication, and then, he had to have surgery?
> A:    No, sir.
> Q:    You've never known any of that?
> A:    No.
> Q:    Okay.
> A:    Not until this minute.
> Q:    Did Dr. Wilke ever share with you as Dr. Stellmacher's advisor the letter Dr. Stephen Clark sent

(continued...)

14

2006, five weeks after Plaintiff last reported to work, and three weeks after Dr. Clark purportedly

told Dr. Wilke that Plaintiff could return to work.  (*See* Pl. Dep. Ex. 8; Termination Letter, Pl.

Dep. Ex. 7).  In the letter, Dr. Wilke explained:

> The basis for the termination is failure to follow through on requirements as set forth in your suspension.  You were placed on probation on August 18, 2006 in response to complaints that you were not answering pages, not being at assigned duty locations, showing up late and not following up on a psychological evaluation requested by the Program.  You were informed that you must address these issues and were expected to behave in a more professional manner.  To date, you have not addressed these issues – your unprofessional behavior has continued.  On September 6, you were suspended with pay for failing to attend rounds over the Labor Day weekend.  Since that time, you have not returned to the office.  Although you state that you are receiving medical treatment, you have refused to furnish physician documentation required by the Program for sick leave, despite the Program's repeated requests for this documentation.  This behavior reflects continued unprofessional behavior warranting termination from the program.

(Id.).

Plaintiff appealed his termination to the Dean's Council on Graduate Medical Education.

(Pl. Dep. p. 116).  Dr. Wilke appeared before the Council and submitted a written statement,

dated November 7, 2006, in which he described in detail Plaintiff's tenure with the Program,

including repeated instances of absenteeism and failure to respond to pages.  (Pl. Dep. Ex. 8).  He

explained Plaintiff's termination as follows:

> Dr. Stellmacher was on-call over the Labor Day weekend.  Our faculty on call, Dr. Daniell, reported to me on Tuesday, September 5, that he did not show up for rounds.  Dr. Behringer and I spoke with him by phone on September 6.  He was at home, having been seen in our emergency department earlier that day.  Dr. Stellmacher claimed that Dr.

---

[22](...continued)
him [(*see infra*)]... about [Plaintiff] and his hemorrhoid surgery?

A:      No, sir.  That would have been considered protected health information, and ... as the residency director, he said that the resident had a health problem that required surgery.  And that was all the information that he felt we needed to know.  That Dr. Stellmacher, if he wished us to know, would tell us more.

(Behringer Dep. pp. 35-36).

Shivalingaiah ... had agreed to take his call.  Dr. Shivalingaiah reported that he had offered her money to take call for him, but the sum was not sufficient, and that she did not agree to take [the] call.[23]  Dr. Stellmacher reported a health concern that had his attention over the weekend and had prompted his visit to the emergency department. Because his behavior (not arriving at assigned duty areas) was one of the issues that placed him on probation, I suspended him.

On Friday, September 8, I emailed Dr. Stellmacher asking to speak with him about his suspension.  He replied on Sunday, requesting a delay in the discussion until he was well.  He was scheduled for surgery the following day.[24]  I spoke with his surgeon that night and he told me that Dr. Stellmacher would likely be out for two weeks.  I asked Dr. Stellmacher to have his surgeon give me that in writing for his file.  I requested that he contact the psychologist who was performing his evaluation no later than Wednesday, September 13 and schedule an appointment for follow-up.

On October 2, 2006, I received a copy of a letter dated September 27, 2006 from his psychologist to Dr. Stellmacher, asking that he reschedule[ ] his missed appointment from that day.[25]

At its meeting of October 6, 2006, the faculty recommended to me that I terminate Dr. Stellmacher's participation in the residency program, based on his failure to follow through on the terms of his suspension.

... We received a call today from his psychologist who reported that Dr. Stellmacher refuses to participate in any further testing on the advice of his lawyer.

(Id.).  Plaintiff also appeared before the Council but did not offer a written statement.  (Pl. Dep. p. 117).

The Council affirmed Plaintiff's termination in a decision dated November 27, 2006.

(Doc. 30, Ex. 15).  In that decision, the Council explained:

The bases for the Program's recommendation to terminate Dr. Stellmacher's appointment in the Program relate to repeated instances of unprofessional behavior.

---

[23]  Plaintiff later testified that he asked Dr. Shivalingaiah to cover his shift so he could leave town for the weekend, and that after she refused to take the shift, he planned to work it himself.  (Pl. Dep. pp. 107-08).

[24]  According to Plaintiff, his surgery was originally planned for September 11, but it was rescheduled by Dr. Clark to September 21st.  (Pl. Dep. p. 88).

[25]  This letter is not included in the court's record.

These instances ... include being absent without leave, lack of awareness related to his interactions with faculty and patients, and failure to timely follow-through on requests that he schedule a psychological evaluation.  When counseled about several instances in January 2006, Dr. Stellmacher was informed by memo dated January 9, 2006 that further unprofessional behavior would be grounds for dismissal.  Dr. Stellmacher was placed on probation on August 18, 2006 after additional instances of being absent without leave and suspended on September 6, 2006 for failing to meet the terms of probation, which included another instance of being absent without leave. ...  Dr. Stellmacher failed to follow the [P]rogram's procedures for requesting medical leave, despite several requests from the program that he do so.  Upon questioning, Dr. Stellmacher said he was aware of the procedures and, in fact, had used them on previous occasions. [Dr. Wilke] emphasized with the committee that the [P]rogram attempted to work with Dr. Stellmacher to address his professionalism issues, but, Dr. Stellmacher did not choose to work with the Program to make appropriate modifications to his conduct....

(Id.).

In a letter dated November 1, 2006, Dr. Clark wrote to Dr. Wilke:

Dr. Stellmacher had surgery performed by me on September 21, 2006, for his hemorrhoids.  His hemorrhoids were extensive and required more than one procedure for this.  Because of this, his postoperative discomfort was out of the ordinary.  He also had difficulty with his wound which contributed to his discomfort.  It is not surprising that Dr. Stellmacher missed a considerable amount of work because of his postoperative discomfort.

I would have written sooner, but my schedule has not allowed me to do so.  In the early part of this month I was out for a total of two week due to board certification requirements, as well as personal vacation....

(Doc. 30, Ex. 17).

To date, Plaintiff has submitted applications to other residency programs in the United States, but has not found employment.  (Pl. Dep. pp. 8-9).  He has had no source of income since he was terminated from the Program.  (Id.).  As of the time of this action, Dr. Wilke was employed by Ross University in the Bahamas and no longer serves as director of the Program. (Behringer Dep. p. 30).  The circumstances of his departure from the Program are not provided in the record.  Meanwhile, Dr. Behringer continues to serve as a resident advisor with the Program.

(Id. p. 9).

## II.   PROCEDURAL HISTORY

Plaintiff filed a charge of discrimination against Defendants with the Equal Employment Opportunity Commission (hereinafter "EEOC") on April 6, 2007.  (Doc. 28, Ex. 3, p. 34 of 35). In it, he alleged that he was unlawfully terminated on the basis of his German national origin, and that he was subjected to a hostile work environment.  (Id.).  On December 19, 2007, the EEOC sent Plaintiff a Dismissal and Notice of Rights, informing him that the events alleged in his charge did not establish that he had been terminated on the basis of discrimination.  (Id., p. 35 of 35).

Plaintiff filed his Complaint in this action on March 18, 2008.  He asserted a disparate treatment claim against the Board of Trustees of the University of Alabama based on his national origin in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000 *et seq*. ("Title VII") (Count I), and the Civil Rights Act of 1866, 42 U.S.C. § 1981 (Count II).  (Doc. 1).  Counts III and IV asserted interference and retaliation claims under the Family and Medical Leave Act of 1993.  Against Dr. Wilke, Plaintiff asserted claims of outrage and invasion of privacy (Counts V & VI, respectively).  Count VII asserted a claim of negligent hiring, training, supervision and retention against the Board of Trustees as to Dr. Wilke.  (Id.).

By Order dated December 15, 2008, the court dismissed Counts II, III, and IV, and ordered Plaintiff to replead his claims against the Board of Trustees under Title VII and against Dr. Wilke for outrage and invasion of privacy.  On December 23, 2008, Plaintiff filed an Amended Complaint, in which he asserted only Counts I, V, and VI.  (Doc. 13).

On February 17, 2010, Defendants filed the pending Motion for Summary Judgment as to all of Plaintiff's claims in the Amended Complaint.  (Doc. 28).  Plaintiff responded in opposition to the motion on March 8, 2010 (Doc. 30), to which Defendants replied on March 18, 2010 (Doc. 31).  The motion is now subject to the court's review.

## III.    STANDARD OF REVIEW

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was based on intentional discrimination.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984).  Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981), *as modified by Desert Palace v. Costa*, 539 U.S. 90, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination.  *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir.

1987).

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a prima facie case of discrimination.  Once the plaintiff proves a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision.  Finally, if the defendant carries its burden, the plaintiff must either prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination or present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision.  *McDonnell Douglas Corp.*, 411 U.S. at 802-05, 93 S. Ct. at 1824-27; *Burdine*, 450 U.S. at 252-54, 101 S. Ct. at 1093-95; *Desert Palace*, 539 U.S. at 101-02, 123 S. Ct. at 2155-56.

IV.    **ANALYSIS**

A.     **Count I – disparate treatment based on national origin**

Plaintiff may prove disparate treatment by presenting either direct or circumstantial evidence of discrimination.  *See Hawkins v. CeoCorp.*, 883 F.2d 977, 982 (11th Cir. 1989). Direct evidence is "evidence which, if believed, would prove the existence of a fact in issue without inference or presumption."  *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990), citing *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989).

The record contains no direct evidence of discrimination by Defendants.  Plaintiff must therefore rely on circumstantial evidence to prove his claim.  *See Hawkins*, 883 F.2d at 982.  To establish a prima facie case of discrimination with circumstantial evidence, Plaintiff must satisfy

the inferential test established by the Supreme Court in *McDonnell-Douglas Corp.*, *supra*.

Specifically, Plaintiff must show that (1) he is a member of a protected class; (2) he was subject

to an adverse employment action; (3) he was qualified for the position he held; and (4) he was

replaced or treated less favorably than someone similarly situated outside of his protected class.

*Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003); *Maynard v. Bd. of*

*Regents of the Div. of Universities of the Florida Dept. of Educ.*, 342 F.3d 1281, 1289 (11th Cir.

2003). *See also McDonnell-Douglas Corp.*, 411 U.S. at 802, 93 S. Ct. at 1824.  Plaintiff must

also demonstrate that the decisionmaker was aware of his protected status at the time of his

termination.  *See Lubetsky v. Applied Card Systems, Inc.*, 296 F.3d 1301, 1306 (11th Cir. 2002)

(plaintiff did not establish prima facie case of religious discrimination because there was no

evidence decisionmaker knew of plaintiff's religion at time of decision); *Silvera v. Orange*

*County School Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001) ("Discrimination is about actual

knowledge, and real intent, not constructive knowledge and assumed intent") (citing *Pressley v.*

*Haeger*, 977 F.2d 295, 297 (7th Cir. 1992) ("[r]acial discrimination [in employment] is an

intentional wrong.  An empty head means no discrimination.  There is no 'constructive intent,'

and constructive knowledge does not show actual intent.")); *Walker v. Prudential Prop. & Cas.*

*Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002) ("When evaluating a charge of employment

discrimination, then, we must focus on the actual knowledge and actions of the decision-maker"),

citing *Bass v. Board of County Comm'rs*, 256 F.3d 1095, 1105 (11th Cir. 2001).

    Defendants argue that Plaintiff cannot establish that he was treated less favorably than

similarly situated residents of other national origins.  Plaintiff responds by identifying several

colleagues, including Princess Robinson (hereinafter "Robinson") and Cynthia Graddick

(hereinafter "Graddick"), as comparators to satisfy this element of his claim.  Robinson and Graddick were both born and educated in the United States, and both completed their residencies with the Program at times unspecified in the record.  (Behringer Dep. pp. 44-45).

After considering the evidence of record, however, the court finds that neither of these individuals was similarly situated to Plaintiff.  Plaintiff appears to argue that the only reason he was terminated was because he took an extended medical leave of absence without providing documentation of his condition from his doctor.  He argues that Robinson and Graddick also took medical leaves of absence but were permitted to complete the Program instead of being terminated.[26]

As discussed extensively *supra*, however, Defendants offer several reasons for terminating Plaintiff – including his failure to answer pages by attending physicians, reporting to the wrong duty location on more than one occasion, excessive absenteeism and tardiness, his "lack of awareness related to his interactions with faculty and patients," and neglecting to timely follow through on a requested psychological evaluation – in addition to his failure to provide documentation of his illness.  (Doc. 30, Ex. 15).

In her deposition, Dr. Behringer further described Plaintiff's tenure with the Program:

A:      Dr. Stellmacher is not consistent.  It is difficult for me to characterize him.
Q:      .... [W]ith regard to what qualities or traits is he not consistent?
A:      He – when he is focused on his tasks or what needs to be done, he can complete them quite well and sometimes exceed expectations.  Keeping – unfortunately, he does not stay focused, and he frequently does not complete tasks assigned to him in any sort of minimal – minimally appropriate form.  So, I did not ever know

---

[26] Princess Robinson took a leave of absence following an automobile accident, for which she was admitted to the hospital's intensive care unit for an unspecified period of time.  (Behringer Dep. p. 44).  Cynthia Graddick took a leave of absence due to pregnancy.  (Id. p. 45).  The record does not provide the length of either absence, or dates on which either absence began or ended.

whether the person who was focused or the person who was not was going to be the one I was teaching that day.

\*\*\*\*\*\*

A:      In my judgment, Dr. Stellmacher's ... medical knowledge was fine.  His application of that knowledge, which would fall under what you are calling skills and proficiency, was very weak.

\*\*\*\*\*\*

A:      In my opinion, Dr. Stellmacher was impulsive and did not think through either the consequences of his actions or given the choice he was making, what other steps he needed to do to mitigate effects on others.

\*\*\*\*\*\*

A:      The concerns that other faculty brought up [regarding Plaintiff] were twofold. They were of a professional or professionalism nature.  He was late or absent without letting anyone know ... on a periodic basis from his assigned residency duties with little or no excuse and no prewarning, no attempt to contact people he was going to be gone.

The other issue appeared to be that he was making leaps of judgment and diagnosis that weren't warranted in the facts and was not thinking through all of the data before he came to a conclusion about a patient or a treatment plan.

\*\*\*\*\*\*

A:      ... I discussed with [Plaintiff] the issues of ... not being present when he was expected to be, of not completing his duties, and, you know, here's how we can – here's how we can change that.  This is important to change, because you're relied upon.  When those things didn't change, that was when things were moved to the residency director level [and brought to Dr. Wilke's attention].

\*\*\*\*\*\*

Q:      ... Did [Plaintiff's] problems affect his ability to care for his patients?
A:      ... yes, they affected the care of his patients....  Those deficiencies are disruptive to patient care and to other residents and faculty who have to do the work that needed to get done that they were depending on him to do.

(Behringer Dep. pp. 20-54) (emphasis added).  The record, meanwhile, contains no evidence to

inform the court of any details regarding Robinson's or Graddick's job performance, including whether either comparator had problems similar to Plaintiff's in carrying out their duties.

The Eleventh Circuit has explained that

[i]n determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways....  In order to satisfy the similar offenses prong, the comparator's misconduct must be **nearly identical** to the plaintiff's in order "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."

*Id.*, quoting *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1344 (11th Cir. 1998) ,

*opinion modified by* 151 F.3d 1321 (11th Cir. 1998); *Holifield v. Reno*, 115 F.3d 1555, 1562

(11th Cir. 1997); *Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999) (emphasis added).

In *Maniccia*, the Eleventh Circuit instructed that

[i]n evaluating whether employees are similarly situated for purposes of establishing a prima facie case of disparate treatment..., [t]he most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishment imposed....  We require that the quantity and quality of the comparator's misconduct be **nearly identical**....

171 F.3d at 1368 (emphasis added).  *See also Silvera*, 244 F.3d at 1259 ("[i]n order to meet the comparability requirement a plaintiff is required to show that he is similarly situated in **all relevant aspects** to the non-minority employee") (emphasis added).

Aside from Plaintiff's testimony that Robinson and Graddick took leaves of absence at some point during their residency, the record contains no evidence that these individuals, like Plaintiff, also failed to report to work on any occasion, was ever late to work, failed to respond to pages by attending physicians, or failed to follow through on a request, if any, by the Program's faculty for a psychological evaluation.  The record is also silent whether Robinson or Graddick

24

failed to provide documentation to explain their absences when requested by the Program. Thus, the court is without evidence suggesting that either comparator engaged in "nearly identical" conduct to Plaintiff's, or was similar to Plaintiff in "all relevant aspects." Accordingly, the court cannot conclude that either Robinson or Graddick was similarly situated to Plaintiff without being terminated.

Plaintiff also points to Malcolm Hendricks (hereinafter "Hendricks") as a possible comparator. According to Plaintiff, Hendricks was allowed to complete the residency program despite committing "a good number of violations." (Pl. Dep. p. 132). The only problem with this argument is that it is not supported by the record. The sum total of the evidence offered on this point is the following deposition testimony by Plaintiff:

> I think he missed call. I know he had uniform or he had attire issues. He had a couple of long-standing issues with [the Program's faculty]. In fact, he was forced to actually go through – I believe it was four weeks in a row of in-service, inpatient family medicine before he was allowed to graduate. He was not terminated. He had particular run-ins with attending[ ] [physicians] as well.

> I don't know the exact specifics of every one of his, you know, professional misgivings during the course of his employment, but I do know that he had a pretty interesting reputation at that time and that he, you know, was more or less at times combative, but, you know, [he] had had some issues with patient care, had some issues with ability to demonstrate a solid knowledge base, more or less; issues which would have been more disconcerting than just [not] showing up [to work] or not answering a page in two minutes flat.

(Id. pp. 132-33). Plaintiff conceded, however, that his knowledge of Hendricks's reputation is based on hearsay from his collegues. (Id. p. 134). He testified that

> A:     I couldn't give a specific example [of Hendricks's misconduct], but on any time in which you are dealing with inpatient care, you know, you are required to more or less be able to produce a pretty good differential diagnosis from day to day and to be pretty understanding of how that diagnosis may change. You know, there were times when as a senior upper level [resident] he would have been a little more

> unflexible in that regard, maybe not as willing to entertain an additional avenue of possible diagnostic workup.   I wouldn't say necessarily it [was due to his] being lazy.
>
> And as to the accustions or as to the characterization of him having run-ins with faculty, again, this is just from me being in the workplace, I can't give you an exact specific example that I know of.  I have not been able to read any of his chart. ...[I]t was just kind of spoken as common knowledge.

Q:     Okay.  So it's based on what people said?

A:     Well, it's based on him having to complete an additional four weeks of inpatient medicine before Wilke let him graduate.

Q:     All right.  Any other people that you say had a similar record to yours [who] were not terminated?

A:     Not that I'm aware of.

(Id. pp. 134-135).

Aside from this testimony, the court sees nothing in the record to support Plaintiff's argument that Malcolm Hendricks engaged in conduct similar to his own without being terminated.  There is not a single example of specific misconduct by Hendricks, nor can the court discern any basis for Plaintiff's argument that Hendricks should have been terminated.  The record is void of evidence explaining why Hendricks was asked to complete an additional four weeks of residency before graduating, or whether that additional training improved his job performance and qualification to graduate.  To the extent Plaintiff implies that he should have been given a similar opportunity to demonstrate his own merit, it is clear that he was given numerous chances to do so during the course of his year with the Program.  (*See, e.g.*, Behringer Dep. pp. 22-23; Pl. Dep. Exs. 4, 5, 7, 8).  He does not dispute that Dr. Behringer and Dr. Wilke repeatedly informed him of areas in which he needed to improve.  (Id.).  However, instead of improving his attendance and reliability, these problems continued, while Plaintiff complained that Dr. Behringer was doing nothing to help him.  (Id.; Pl. Dep. pp. 32-34).

26

Upon considering the record in its entirety, the court finds insufficient evidence to agree with Plaintiff that either Princess Robinson, Cynthia Graddick, or Malcolm Hendricks engaged in conduct that was "nearly identical" to Plaintiff's to satisfy this element of Plaintiff's claim. Plaintiff offers little more than generalized conjecture in his deposition testimony to explain how these individuals compare to himself. Without evidence that any resident of non-German or non-foreign national origin engaged in conduct nearly identical to Plaintiff's and was not terminated therefor, the court cannot conclude that Plaintiff has satisfied this element of his claim.[27]

Plaintiff also offers no evidence that Dr. Wilke, or anyone else on the faculty, was aware of his national origin when he was terminated. Although there is disputed evidence that Dr. Behringer knew of his national origin (*see* Pl. Dep. pp. 24-28, 130-31), Plaintiff neither argues nor submits evidence that she alone made the decision to terminate him, or that she exerted any influence over other faculty members to recommend his termination. Accordingly, Plaintiff has not presented a prima facie case of discrimination.

However, even if Plaintiff has presented a prima facie case, his claim still fails because he has not demonstrated that Defendants' proferred non-discriminatory reason for terminating him

---

[27] Plaintiff offers several additional comparators in his Amended Complaint. (Doc. 13). He alleges that Dr. Keisha James was absent from her assigned work station "several times" (¶¶ 23-25); Dr. John Jones, Dr. Stephanie Burrell, and Dr. Laura Lee Taylor all engaged in patient care that led to loss of life or threatened loss of life (¶¶ 26-49); Dr. Ivan Pivovavrov failed a pediatrics rotation (¶¶ 50-52); and Dr. Kris Jones was, Plaintiff believes, involved in an extra marital affair with a nurse at the hospital (¶¶ 53-56). Each of these residents is of American national origin, and none of them were terminated for their above alleged conduct. (Id.).

However, the record contains no reference of any kind to any of these individuals, nor does Plaintiff address any of them in his brief. Regardless, the court finds no merit to Plaintiff's claim that these residents were similarly situated to himself "in all relevant aspects," or that they engaged in conduct that was "nearly identical" to Plaintiff's. Even if the court assumed that Plaintiff's allegations in the Amended Complaint are true, Plaintiff does not allege that any of these individuals engaged in a pattern of repeated misconduct for which the faculty expressed concern on numerous occasions in a single year. The court, therefore, finds these unsupported claims in Plaintiff's Amended Complaint insufficient to satisfy this element of his claim.

was a pretext for discrimination.  As stated above, Defendants argue that Plaintiff was terminated for numerous and repeated occurrences of unprofessional conduct.

Plaintiff maintains that these proferred reasons are a pretext for discrimination.  To support this argument, Plaintiff claims that Dr. Wilke planned to increase the number of American-educated residents in the Program, in hopes of increasing the Program's prestige among other family medicine residency programs in the United States.  (Pl. Dep. pp. 125-27).  In deposition, Plaintiff testified that Drs. Wilke and Behringer said as much during resident meetings that Plaintiff attended.  (Id. pp. 125-128).  It is not clear to the court whether, with this testimony, Plaintiff argues that he was terminated for his German national origin, which is a protected class under Title VII, or the fact that he was educated in the Bahamas, which is not. *See* 42 U.S.C. § 2000e-2(a)(1) (prohibiting employment discrimination on the basis of "race, color, religion, sex, or national origin").  Nevertheless, Plaintiff does not provide any details about these meetings, including when they were held, who else was in attendance, or the approximate number of times either Dr. Wilke or Dr. Behringer made reference to this plan. Meanwhile, such statements suggest only that Dr. Wilke wanted to improve the Program's reputation by being more selective of incoming residents based on where they had been educated. Plaintiff offers no authority for the proposition that such a plan evidences a discriminatory animus toward residents of foreign national origin, as opposed to those with educations from outside the United States.

Plaintiff, nevertheless, points to four residents who are of unspecified foreign national origin and education, and who were also terminated around the same time as Plaintiff:  Dr. Porey,

Dr. Phil Rasetti, Dr. Babar, and Dr. Seema Gupta.[28, 29]  (Pl. Dep. pp. 159-60).  Plaintiff argues

that these terminations are evidence that Dr. Wilke terminated residents who, like Plaintiff, had

been educated outside the United States, to further his plan to increase the number of American-

educated residents in the Program.

The court disagrees.  Plaintiff does not dispute, for example, that each of these

individuals, like himself, was hired by Dr. Wilke with knowledge of where they had been

educated.  (*See* Pl. Dep. p. 128).  Furthermore, the record does not show well these individuals

performed in their jobs, or whether they exhibited any problems with attendance or puncuality.

The court is also unable to determine the number of other residents, if any, who were also of

foreign national origin and/or education and were not terminated.  Based on the record before it,

the court will not merely assume that these residents were terminated because of their national

origin or places of education.  Meanwhile, Dr. Behringer testified that they – along with an

unspecified number of American-born and educated residents – were terminated due to concerns

about their "professionalism, honesty, and performance."  (Behringer Dep. pp. 48-50).  Plaintiff

offers no rebuttal to this testimony.  Although Plaintiff concedes that Dr. Wilke hired him with

knowledge of his national origin, he believes this was only because Dr. Wilke was desperate to

fill a vacancy in the Program.  (Pl. Dep. p. 40).  He offers no evidence to support this claim,

however.  The record does not specify how many other candidates Dr. Wilke considered – and

---

[28]  The record does not specify the number of residents who were employed by the Program when Plaintiff worked there, or what percentage of residents were of American national origin compared to residents born and/or educated outside the United States.

[29]  The record gives inconsistent names to the residents referred to by Plaintiff on this point.  The names indicated *supra* are taken from Dr. Behringer's deposition testimony.  (Behringer Dep. p. 48).  Plaintiff's deposition transcript gives the following names for these individuals: Dr. Puri, Dr. Pillarisetty, Dr. Babar and Dr. Seema Gupta. (Pl. Dep. pp. 159-60).

rejected – when he hired Plaintiff, including whether any were of American birth or education.

Finally, Plaintiff does not argue, nor does the record suggest, that any foreign born or educated

residents who were terminated were replaced by candidates who were born and/or educated in

the United States.  In short, the court lacks sufficient evidence to agree with Plaintiff that the

terminations of Drs. Porey, Rasetti, Babar, and Gupta suggest that Defendants' reason for

terminating him is a pretext for discrimination.

Plaintiff also points to his performance evaluations as evidence of pretext.  Many of these

evaluations contain positive commentary of his job performance.  (*See* Doc. 30, Exs. 1-14).

Indeed, the record does suggest that his attending physicians held generally favorable opinions of

Plaintiff, and that he passed all but one of his rotations.  (Id.; Am Compl. ¶ 14).[30]  For example,

various attending physicians remarked on Plaintiff's fund of knowledge, his extensive reading

and research into patient care, his desire to perform well as a physician, his ability to prioritize,

his improved performance during the course of a rotation, his analytical skills, his ability to work

as a team member, and even his punctuality.  (Doc. 30, Exhs. 1-14).

While these evaluations are probative of Plaintiff's general success in the Program, they

do not, by themselves, contradict other evidence that Plaintiff also exhibited significant

problems, many of which are also addressed in his performance evaluations.  These include poor

attendance and punctuality (doc. 30, ex. 13), unspecified instance(s) where Plaintiff was

dishonest with his attending physician(s) (id.), his habit of "interrupting others" (doc. 30, ex. 14)

---

[30]  Plaintiff's Amended Complaint contains two paragraphs numbered 14, the second of which contains the reference cited *supra*.  Defendants deny that Plaintiff passed all but one of his rotations (*see* Answer (Doc. 17)), but offer no evidence that contradicts this assertion by Plaintiff.  At this juncture, the court accepts all disputed facts in the light most favorable to Plaintiff.

his need to "slow down" to avoid making mistakes, and "to be sure he <u>accurately</u> completes

orders, etc." (doc. 30, ex. 5) (emphasis in original).[31]  Plaintiff was also noted for his "[t]rouble

working with staff – issues on availability, timeliness," and that "sometimes [he] does not

complete task[s].  Needs to be careful and thorough."  (Id.).  Dr. Wilke, who supervised Plaintiff

on a home visit during a community medicine rotation, explained: "Only one visit with Ed, he

did not secure a second because (I believe) he was not aware that it had been scheduled until I

called him.  This is emerging as a theme in his behavior.  He needs to pay stricter attention to his

schedule."  (Doc. 30, Ex. 7).  As previously stated, Plaintiff was given several opportunities to

correct these issues.  He was terminated only after he had already been placed on probation and

later suspended when those problems did not improve.  Indeed, Plaintiff was not terminated until

five weeks after he missed work Labor Day weekend, the first three of which were before his

surgery, when Dr. Clark was still in his office and available to provide documentation of

Plaintiff's condition.

In a final attempt to demonstrate pretext, Plaintiff quarrels with Dr. Wilke's request for

written documentation by Dr. Clark.  He maintains that Dr. Wilke was satisfied with Dr. Clark's

explanation of Plaintiff's condition over the phone but then, without warning, Dr. Wilke

demanded something in writing when Dr. Clark was no longer available to oblige his request.

Plaintiff's only evidence to support this argument is his deposition testimony that he was

present when Dr. Clark spoke over the telephone with Dr. Wilke about his condition.  (Pl. Dep.

p. 84).  He therefore heard Dr. Clark's side of the conversation, but nothing of what Dr. Wilke

said, including whether Dr. Wilke requested written documentation by Dr. Clark before he went

---

[31]  None of these comments are explained with any specificity in the evaluations or elsewhere in the record.

on vacation.  The record is clear that Plaintiff did not have surgery until September 21 –

approximately three weeks after he missed work Labor Day weekend – and that Dr. Clark did not

go on vacation until after the surgery.  (Pl. Dep. Ex. 17).  Dr. Behringer testified that several

requests for documentation were made, both before and after the surgery.  (Behringer Dep. p. 68).

Plaintiff offers no explanation for why these requests were not answered until November 1, two

months after Labor Day.

      "Proof that the defendant's explanation is unworthy of credence is ... one form of

circumstantial evidence that is probative of intentional discrimination."  *Reeves v. Sanderson*

*Plumbing Products, Inc.*, 530 U.S. 133, 147, 120 S. Ct. 2097, 2108, 147 L. Ed. 2d 105 (2000).

The Eleventh Circuit has explicated this standard by instructing that,

> [t]o show that the employer's reasons were pretextual, the plaintiff must demonstrate
> "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in
> the employer's proffered legitimate reasons for its action that a reasonable factfinder
> could find them unworthy of credence."

*Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004), quoting *Combs v. Plantation*

*Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997).  "If the employer's articulated reasons are ...

found to be pretextual, leaving no valid reason for the employer's actions, it is likely that

discrimination was the true reason."  *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d

1181, 1184 (11th Cir. 1984).  As long as Defendants' proffered reasons "might motivate a

reasonable employer, an employee must meet that reason head on and rebut it, and the employee

cannot succeed by simply quarreling with the wisdom of that reason."  *Wilson v. B/E Aerospace,*

*Inc.*, 376 F.3d 1079*, 1088 (11th Cir. 2004), citing *Chapman v. AI Transport*, 229 F.3d 1012,

1030 (11th Cir. 2000).  *See also Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1341 (11th

Cir. 2000) (Title VII case) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated.").  Furthermore, "[f]ederal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA [or Title VII] does not interfere. Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988) (citations omitted)); *see Abel v. Dubberly*, 210 F.3d 1334, 1339 n. 5 (11th Cir. 2000) ("Although termination may, to some, seem a draconian response given the level of the Plaintiff's offense, the reasonableness of [an employer's] disciplinary policies are not a consideration.  As we have said before, an 'employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason'") (quoting *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984).  "We 'do not ... second-guess the business judgment of employers." *Chapman*, 229 F.3d at 1030, *Combs*, 106 F.3d at 1543; *accord Alexander*, 207 F.3d at 1339, 1341; *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) ("We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law. We are not in the business of adjudging whether employment decisions are prudent or fair").

Having considered the arguments and evidence offered by Plaintiff, the court is not convinced that Defendants' proferred reasons for terminating him contain "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that a reasonable factfinder

33

could find them "unworthy of credence."  *See Cooper*, *supra*.  It is therefore concluded that

Plaintiff has not shown that Defendants' reasons for terminating him are a pretext for

discrimination.  For that reason, and for his failure to present a prima facie case of disparate

treatment based on his national origin, Defendants are entitled to summary judgment on this

claim.

> **2.     State law claims against Dr. Wilke**

Plaintiff also asserts claims of outrage and invasion of privacy against Dr. Wilke

individually.  To support his outrage claim, Plaintiff explains that Dr. Wilke terminated him after

announcing his belief that Plaintiff needed to be evaluated by a psychologist.  This, according to

Plaintiff, constituted extreme and outrageous conduct, because it was "highly damaging to the

Plaintiff's reputation," and because Dr. Wilke "knew or should have known" that such conduct

would make it impossible for Plaintiff to find work again.

A claim of outrage has been recognized by the Alabama Supreme Court in only three

contexts: (1) wrongful conduct in family burials, *see Whitt v. Hulsey*, 519 So. 2d 901 (Ala. 1987),

(2) heavy-handed, barbaric means by insurance agents in attempting to coerce an insured into

settling an insurance claim, *see Nat'l Sec. Fire & Cas. Co. v. Bowen*, 447 So. 2d 133 (Ala. 1983),

and (3) egregious sexual harassment, *see Busby v. Truswal Sys. Corp.*, 551 So. 2d 322 (Ala.

1989).

No court has specifically held that these three circumstances are the only allowable bases

for an outrage claim.  In general, Plaintiff may establish a viable claim of outrage by

demonstrating that Dr. Wilke's conduct was (1) intentional or reckless; (2) extreme and

outrageous; and (3) caused emotional distress so severe that no reasonable person could be

expected to endure it.  *Thomas v. Industrial Contractors, Inc.*, 624 So. 2d 1041, 1043 (Ala. 1993), citing *American Road Service Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980).  However, assuming (without deciding) that Dr. Wilke acted intentionally or even recklessly by terminating Plaintiff, the court is not satisfied that the evidence before it demonstrates conduct that is extreme or outrageous.  In *Bowen,* the Alabama Supreme Court described conduct that generally supports an outrage claim as "conduct [that is] so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society...."  *Bowen*, 447 So. 2d at 141.  The facts alleged in Plaintiff's Amended Complaint do not rise to a level of atrocity comparable to the range of conduct alleged in the cases cited *supra*.

For example, in *Bowen*, the following facts were deemed "sufficient" to support the plaintiff's outrage claim: (1) the defendants' obtaining, through bribery and extortion, false evidence to support criminal charges against the plaintiff; (2) threats by the defendants to kill the plaintiff's two small children and to cut the children's arms off; and (3) kidnaping the plaintiff, driving him into the woods, and forcing him to lie on the ground while holding a gun to his head, repeatedly snapping the hammer for an hour and a half before the plaintiff finally escaped – all in an effort to force the plaintiff to settle an insurance claim.  447 So.2d at 137.  In *Whitt*, the defendant's alleged destruction and desecration of the plaintiffs' century-old family cemetery was considered extreme enough, in light of the "[g]reat respect [that] is afforded the resting place of the dead," to constitute outrageous conduct.  519 So. 2d at 905-06.  Finally, in *Busby*, female employees were entitled to recover for outrage based on multiple allegations of extreme sexual harassment by their supervisor.  551 So. 2d at 324.

In the present case, it is undisputed that Dr. Wilke asked Plaintiff to undergo a psychological evaluation nine months before the faculty – as a group – recommended his termination.  (Pl. Dep. Ex. 8).  Plaintiff also does not dispute that, during the nine months after Dr. Wilke requested the evaluation, he was repeatedly absent from work or reported to the wrong work stations after misreading his schedule, and failed to answer pages by physicians who were looking for him.  Furthermore, Plaintiff does not dispute that he was absent from work for five weeks, after Dr. Clark told Dr. Wilke he would need to miss only two, and did not provide a written explanation from Dr. Clark for his absence.  Finally, Plaintiff cites to no authority, and the court is aware of none, for the proposition that an employer that asks an employee for a psychological evaluation may not, months later, terminate that employee for any reason without subjecting itself to liability for outrage.

The court does not intend to make light of any damage to Plaintiff's reputation that may have resulted from his termination.  However, the court is not satisfied that the evidence before it demonstrates extreme or outrageous conduct, especially in comparison with the facts alleged in *Bowen*, *Whitt,* and *Busby*.  Accordingly, the motion for summary judgment is due to be granted as to this claim.

### b.    Invasion of Privacy

In the final count of his Amended Complaint, Plaintiff asserts an invasion of privacy claim against Dr. Wilke.  A claim for invasion of privacy requires Plaintiff to demonstrate one of the following: (1) Dr. Wilke intruded into Plaintiff's physical solitude or seclusion; (2) he gave publicity to private information about Plaintiff that violates ordinary decency; (3) Dr. Wilke put Plaintiff in a false, but not necessarily defamatory, position in the public eye; or (4) Dr. Wilke

36

appropriated some element of Plaintiff's personality for a commercial use. *Johnston v. Fuller*, 706 So. 2d 700, 701 (Ala. 1997); *Norris v. Moskin Stores, Inc.,* 132 So. 2d 321, 322-23 (Ala. 1961); *Ex parte The Birmingham News*, 778 So. 2d 814, 818 (Ala. 2000).

Here, Plaintiff argues that Dr. Wilke invaded his privacy by telling Dr. Lourdes Corman, the Division Chief of Internal Medicine and an attending physician in the Internal Medicine Department, that he had asked Plaintiff to submit to a psychological evaluation.  He argues that Dr. Corman did not serve on the faculty of the family medicine residency program, and thus had no reason to know about Dr. Wilke's request.  Plaintiff avers that "[a] reasonable jury could find that the disclosure of the Defendants' 'request' that the Plaintiff undergo a psychological evaluation would be highly offensive to a reasonable person.  Psychological care carries with it a stigma, and an inference, that the person evaluated is unstable or otherwise faulty."  (Pl's Brief (Doc. 30), p. 24).  Plaintiff maintains that, because Dr. Wilke told Dr. Corman about the request, Plaintiff could "reasonably infer[ ] that ... more than a few people were aware of such request." (Id.).

In *Johnston*, *supra*, the Alabama Supreme Court found persuasive the reasoning of the Restatement (Second) of Torts § 652D (1977), which addresses invasion of privacy claims where a plaintiff alleges that a defendant gave publicity to private information about him/her.  706 So. 2d at 703.  *See also Ex parte The Birmingham News*, 778 So. 2d at 818 (same).  Specifically, the Restatement provides that

> One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that
>
> (a) would be highly offensive to a reasonable person, and
> (b) is not of legitimate concern to the public.

Restatement (Second) of Torts § 652D (1977).  Comment A to § 652D instructs that the "key

element" of an invasion of privacy claim is "publicity":

> "Publicity," as it is used in this Section, differs from "publication," as that term is used in
> § 577 in connection with liability for defamation. "Publication," in that sense, is a word
> of art, which includes any communication by the defendant to a third person. "Publicity,"
> on the other hand, means that the matter is made public, by communicating it to the
> public at large, or to so many persons that the matter must be regarded as substantially
> certain to become one of public knowledge. The difference is not one of the means of
> communication, which may be oral, written or by any other means. It is one of a
> communication that reaches, or is sure to reach, the public.
>
> Thus it is not an invasion of the right of privacy, within the rule stated in this Section, to
> communicate a fact concerning the plaintiff's private life to a single person or even to a
> small group of persons. On the other hand, any publication in a newspaper or a magazine,
> even of small circulation, or in a handbill distributed to a large number of persons, or any
> broadcast over the radio, or statement made in an address to a large audience, is sufficient
> to give publicity within the meaning of the term as it is used in this Section. The
> distinction, in other words, is one between private and public communication.

*Id*., cmt. a (1977).

Comment A also provides the following illustrations that are instructive as to which

circumstances give rise to a claim for damages for invasion of privacy and which do not:

> 1. A, a creditor, writes a letter to the employer of B, his debtor, informing him that B
> owes the debt and will not pay it. This is not an invasion of B's privacy under this
> Section.
>
> 2. A, a creditor, posts in the window of his shop, where it is read by those passing by on
> the street, a statement that B owes a debt to him and has not paid it. This is an invasion of
> B's privacy.
>
> 3. A, a motion picture exhibitor, wishing to advertise a picture to be exhibited, writes
> letters to a thousand men in which he makes unprivileged and objectionable statements
> concerning the private life of B, an actress. This is an invasion of B's privacy.

*Id.*

The sum total of the facts alleged to support Plaintiff's invasion of privacy claim are as

38

follows: Dr. Wilke asked Plaintiff to undergo a psychological evaluation in January 2006; according to Plaintiff, this request was not made again until the following August; at some unspecified point during Plaintiff's tenure with the Program, Dr. Wilke told Dr. Corman – who was Plaintiff's attending physician and supervisor during his rotation in Internal Medicine – that he had asked Plaintiff to submit to an evaluation; Dr. Corman informed Plaintiff, at some other unspecified point in time, that Dr. Wilke had told her of this request.  (Pl. Dep. pp. 44-45, 66, 138-40; Pl. Dep. Ex. 4).  From this, Plaintiff inferred – but offers no evidence tending to prove – that an unspecified number of people (i.e., "more than a few," (*see* Pl.'s Brief (Doc. 30), p. 25)) must have also known about Dr. Wilke's request.

Defendants argue, and the court agrees, that these facts fail to give rise to a claim of invasion of privacy.  While the Restatement, and by extension, the Alabama Supreme Court, has declined to specify a number of persons necessary for a communication to be "publicized," it is clear that more than one such person is required to support an invasion of privacy claim, especially in such circumstances as those presented here.  Plaintiff has offered evidence that Dr. Wilke told only one person about his request.  Therefore, consistent with *Johnston* and its progeny, these facts do not establish that Dr. Wilke "publicized" his request as contemplated by the Restatement or by Alabama courts.

Dr. Wilke offers state agent immunity as an additional basis to avoid liability to Plaintiff's outrage and invasion of privacy claims.  Because the court finds no merit to either claim, however, it does not address whether Dr. Wilke is entitled to state agent immunity in this case.

39

V.       **CONCLUSION**

Having found that no genuine issue of material fact remains as to Plaintiff's

discrimination, outrage, or invasion of privacy claims, and that Defendants are entitled to

judgment as a matter of law as to these claims, the court concludes that Defendants' Motion for

Summary Judgment is due to be granted.  A separate Order will be entered contemporaneously

herewith.

**DONE** this the 7th day of July, 2010.

*John E. Ott*

**JOHN E. OTT**
United States Magistrate Judge